UNITED STATES DISTRICT COURT`
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
SAFE HARBOR POLLUTION INSURANCE,
STARR INDEMNITY & LIABILITY COMPANY,
ARGONAUT INSURANCE COMPANY AND
BERKSHIRE HATHAWAY SPECIALTY
INSURANCE COMPANY,

Civ. 18-5942

Plaintiffs,

-against-

RIVER MARINE ENTERPRISES, LLC,
WESTERN RIVER ASSETS, LLC and
GATE CITY RIVER TRANSPORTATION, LLC,

Defendants.

-and-

LIBERTY MUTUAL INSURANCE COMPANY,
NAVIGATORS INSURANCE COMPANY, and
ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY,

Intervenor Counterclaim
Plaintiffs.
--------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND TO DISMISS FOR FAILURE TO STATE A CLAIM

NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, Seventh Floor
New York, New York 10005
(212) 220-3830

*Attorneys for Plaintiff*

Of Counsel:   Guerric S.D.L. Russell
              Patrick Nolan

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 3

    I.      The Policy ...................................................................................... 3

    II.     The GATE CITY ........................................................................... 4

    III.    The Administrative Order ............................................................. 5

    IV.   The Sinking of the GATE CITY and Subsequent Investigation.................................. 6

ARGUMENT ....................................................................................................... 6

    POINT I

        SUMMARY JUDGMENT STANDARD ........................................ 6

    POINT II

        THIS DISPUTE IS GOVERNED BY MARITIME LAW OR
        IN ITS ABSENCE, NEW YORK LAW ........................................ 7

    POINT III

        THE SAFE HARBOR POLICY WAS VOID AT THE TIME
        THE GATE CITY  SANK AS RIVER MARINE FAILED
        TO COMPLY WITH AN EXPRESS WARRANTY IN THE
        POLICY TO EXERCISE DUE DILIGENCE TO MAINTAIN
        THE VESSEL IN A SEAWORTHY CONDITION ........................ 8

        A.     The Safe Harbor Policy Contains an Express Warranty
                which if Breached Voids the Policy as a Matter of Law
                and as a Matter of Contract ................................................. 8

        B.     The GATE CITY Was Unseaworthy Prior to Sinking ........................................ 11

        C.     River Marine Did Not Exercise Due Diligence to Maintain the GATE CITY ..... 12

    POINT IV

        RIVER MARINE FAILED TO PROVIDE TIMELY NOTICE OF AN
        OCCURRENCE WHICH VITIATES COVERAGE UNDER THE POLICY ................ 13

A.    Section 3420 of New York Insurance does not Apply to this
      Marine Insurance Contract.......................................................................... 14

B.    New York's Common-Law "No Prejudice" Rule Applies
      to the Safe Harbor Policy and River Marine Failed to Provide
      Timely Notice of an Occurrence.......................................................... 16

C.    Even if Safe Harbor is Obligated to Demonstrate Prejudice
      by River Marine's Late Notice of the Administrative Order,
      Safe Harbor has been Materially Prejudiced as a Matter of Law ........................ 20

POINT V

RIVER MARINE FAILED TO DISCLOSE MATERIAL FACTS
CONCERNING THE INSURED RISK TO SAFE HARBOR
AND SAFE HARBOR MAY VOID  THE POLICY *AB INITIO*
UNDER THE DOCTRINE OF *UBERRIMAE FIDEI* ...................................................... 21

POINT VI

RIVER MARINE'S CLAIM FOR BAD-FAITH COVERAGE
DENIAL MUST BE DISMISSED AS A MATTER OF LAW....................................... 23

CONCLUSION…………………………………………………………………………25

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ........................................... 6

*Argo Corp. v. Greater N.Y. Mut. Ins. Co.*,
  4 N.Y.3d 332, 827 N.E.2d 762 (N.Y. 2005) .................................................. 17, 19

*Atlantic Cas. Ins. Co. v. Value Waterproofing*, *Inc.*,
  918 F. Supp. 243 (S.D.N.Y. 2013) ............................................................ 20

*Borkowski v. Borkowski*,
  355 N.E.2d 287 (N.Y. 1976) ................................................................... 24

*Caitlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Services, Inc.*,
  979 F. Supp. 2d 181 (D.P.R. 2013),
  *aff'd as modified sub nom.* at 778 F.3d 69 (1st Cir. 2015) .................................... 22

*Carlson v. American Intern. Group, Inc.*,
  30 N.Y.3d 288, 89 N.E.3d 490 (N.Y. 2017) ...................................................... 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). ........................................ 6

*Chrysler First Financial Servs. Corp. of Am. v. Chicago Title Ins. Co.*,
  226 A.D.2d 183, 641 N.Y.S.2d 13 (N.Y. App. Div. 1996) ...................................... 20

*Com. Union Ins. Co. v. Int'l Flavors & Fragrances, Inc.*,
  822 F.2d 267, 56 USLW 2037 (2d Cir. 1987) .................................................. 20

*Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*,
  190 F.3d 26 (2d Cir. 1999)............................................................. 7, 9, 10

*DeGeorge v. ACE Am. Ins. Co.*,
  No. 07-CV-2761, 2008 WL 180786 (S.D.N.Y. Jan. 17, 2008) .................................. 15

*Eccobay Sportswear, Inc. v. Providence Washington Ins. Co.*,
  585 F. Supp. 1343 (S.D.N.Y.1984)............................................................ 25

*Farrell Lines, Inc. v. Columbus Cello-Poly Corp.*,
  32 F. Supp. 2d 118 (S.D.N.Y. 1997)........................................................... 8

*Fed. Ins. Co. v. PGG Realty, LLC*,
  538 F. Supp. 2d 680 (S.D.N.Y. 2008)......................................................... 11

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*,
  822 F.3d 620, 2016 A.M.C. 1217, 2016 WL 2943139 (2d Cir. 2016) ............................ 7, 22

*Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*,
  413 F.3d 307 (2d Cir. 2005)................................................................ 7

*Government Employees Ins. Co. v. Elman*,
  40 A.D.2d 994, 338 N.Y.S.2d 666 (N.Y. App. Div. 1972) .................................. 18

*Gulfstream Cargo, Limited v. Reliance Ins. Co.*,
  409 F.2d 974 (5th Cir. 1969) ............................................................ 22

*Indian Harbor Ins. Co v. City of San Diego*,
  972 F. Supp. 2d 634 (S.D.N.Y. 2013),
  *aff'd*, 586 F. App'x 726 (2d Cir. 2014).............................................. 17, 18

*Insurance Co. of N. Amer. v. Zaglool*,
  526 F. Supp. 2d 361 (E.D.N.Y. 2007) ............................................... 7, 10, 15

*Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*,
  376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964)...................................... 11

*Jane Street Holding, LLC v. Aspen Amer. Ins. Co.*,
  No. 13-CV-2291(RWS), 2014 WL 28600 (S.D.N.Y. Jan. 2, 2014)........................... 24

*Jarvis Towing & Transp. Corporation v. Aetna Ins. Co.*,
  298 N.Y. 280, 82 N.E.2d 577 (N.Y. 1948) .............................................. 10

*Knight v. U.S. Fire Ins. Co.*,
  804 F.2d 9 (2d Cir. 1986) ............................................................. 22

*Kron v. Hanover Fire Ins. Co.*,
  20 A.D.2d 670, 246 N.Y.S.2d 848 (N.Y. App. Div. 1964) ................................ 11

*Levine v. Aetna Ins. Co.*,
  139 F.2d 217 (2d Cir. 1943)........................................................... 10

*M.Z. Discount Clothing Corp. v. Meyninger*,
  23 F. Supp. 2d 270 (E.D.N.Y. 1998) ................................................... 17

*Mark A. Varrichio & Assocs. v. Chi. Ins. Co.*,
  312 F.3d 544 (2d Cir. 2002)........................................................... 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)................................... 6

*McAllister Lighterage Line, Inc. v. Ins. Co. of N. Am.*,
  244 F.2d 867 (2d Cir. 1957)........................................................... 11

*N.Y. Marine & Gen. Ins. Co. v. Travelers Prop. Cas. Co. of Am.*,
  485 F. Supp. 3d 398 (S.D.N.Y. 2020)............................................. 15, 17, 18

*New York Univ. v. Continental Ins. Co.*,
   662 N.E.2d 763 (N.Y. 1995) ................................................................. 25

*NY Marine & General Ins. Co. v. Tradeline (L.L.C.)*,
   266 F.3d 112 (2d Cir. 2001) ................................................................. 22

*Olin Corp. v. Ins. Co. of N. Am.*,
   966 F.2d 718 (2d Cir. 1992) ............................................................ 19, 20

*Olin Corp. v. OneBeacon Am. Ins. Co.*,
   864 F.3d 130 (2d Cir. 2017) ................................................................... 8

*Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*,
   472 F.3d 33 (2d Cir. 2006) ................................................................ 8, 11

*Progressive Northeastern Ins. Co. v. American Ins. Co.*,
   No. 99-CV-8998 (SHS), 2001 WL 959183 (S.D.N.Y. Aug. 21, 2001) .............................. 15

*Puritan Ins. Co. v. Eagle S.S. Co.*,
   779 F.2d 866 (2d Cir. 1985) ................................................................. 21

*RLI Ins. Co. v. JDJ Marine, Inc.*,
   No. 07 Civ. 9546, 2012 WL 3765026 (S.D.N.Y. Aug. 29, 2012) ................................. 22

*Rocanova v. Equitable Life Assur. Socy. of U.S.*,
   634 N.E.2d 940 (N.Y. 1994) ................................................................. 25

*Rockland Exposition, Inc. v. Marshall Sterling Enters., Inc.*,
   130 A.D.3d 1095, 31 N.Y.S.3d 139 (N.Y. App. Div. 2016) .................................... 19

*Scottsdale Ins. Co. v. McGrath*,
   No. 19-CV-07477, 2021 WL 3077578 ........................................................... 24

*Seiden Assocs., Inc. v. ANC Holdings*,
   959 F.2d 425 (2d Cir. 1992) ................................................................... 8

*Smith v. Lightning Bolt Prods.*,
   861 F.2d 363 (2d Cir. 1988) ................................................................. 24

*Starr Indem. & Liab. Co. v. Marine Env't Remediation Grp., LLC*,
   No. 17-CV-9881(LGS), 2018 WL 3611970 (S.D.N.Y. July 27, 2018) ............................... 7

*State of N.Y. v. Blank*,
   27 F.3d 783 (2d Cir. 1994) ................................................................. 20

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
   413 F. Supp. 3d 290 (S.D.N.Y. 2019) .................................................... 18, 19

*Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa.*,
    247 F. 2d 116 (5th Cir. 1957) ................................................................ 12

*U.S. v. Banda Boats, Inc.*,
    990 F.2d 626 (5th Cir. 1993) ................................................................ 13

*Unigard Sec. Ins. Co., Inc., v. North River Ins. Co.*,
    79 N.Y.2d 576, 594 N.E.2d 571 (N.Y. 1992) ................................. 14, 17

*Vanderbilt v. Indemnity Ins. Co.*,
    265 A.D. 495 (N.Y. App. Div. 1943) ................................................ 18

*Walker v. Sheldon*,
    179 N.E.2d 497 (N.Y. 1961) ................................................................ 24

**Statutes**

N.Y. Ins. Law § 1113 ................................................................................ 15

N.Y. Ins. Law § 2117 ................................................................................ 15

N.Y. Ins. Law § 3106 ................................................................................ 10

N.Y. Ins. Law § 3420 ...................................................................... 14, 15, 16

**Rules**

Fed. R. Civ. P. 12 ...................................................................................... 2

Fed. R. Civ. P. 56 ...................................................................................... 2

## PRELIMINARY STATEMENT

The Tug GATE CITY, operated by defendant River Marine Enterprises, LLC ("River Marine"), sank at its mooring sometime during the night hours between January 9 and 10, 2018 – approximately 35 days after the United States Coast Guard ("USCG") had advised it that the vessel was showing signs that she was taking on water; and Ordered the removal of all oil.  By the time of the sinking, River Marine had not cleaned up the oil, which caused a significant pollution incident in the Big Sandy River.  River Marine claims that the vessel sank rapidly that night because some unknown/unidentifiable debris punctured the hull in the area of the engine room – this contention is disputed by plaintiffs.  However, the dilapidated and deteriorated condition of the GATE CITY at the time of the sinking is not in dispute.  The photo and video evidence speaks for itself.

Plaintiffs Starr Indemnity & Liability Company, Argonaut Insurance Company and Berkshire Hathaway Specialty Insurance Company insured River Marine under the terms and conditions of a vessel pollution liability insurance policy, bearing Policy No. V-13970-17 with effective dates of August 1, 2017 to August 17, 2018 (*see*, R. Doc. 9-1), issued by plaintiff Safe Harbor Pollution Insurance (the "Safe Harbor Policy").

The Safe Harbor Policy contained an express warranty under which River Marine "warranted" that it "shall at all times use due diligence to maintain [the GATE CITY] in a seaworthy condition."  The facts show that River Marine breached this warranty. River Marine left the vessel moored on banks of the Big Sandy River unused, unmaintained and subject to the elements for nearly a decade before she sank.  By that time, the steel hull was riddled with corrosion and the vessel's systems were in a state of total disrepair.  This is sufficient to prelude coverage under the policy even though the cause of the sinking is in dispute.  A breach of an express warranty in a marine insurance policy precludes coverage regardless of its causal

connection to the loss.  So, even if some unknown or unidentified debris punctured the hull between January 9 and 10, 2018, River Marine's breach of the express warranty precludes coverage nonetheless.

River Marine also failed to provide plaintiffs with timely notice that the GATE CITY was taking on water; and that River Marine had been Ordered by the USCG to remove all oil from the vessel.  The Safe Harbor Policy requires immediate notice of such occurrences.  Instead, through its inactivity, River Marine let a $4,500 clean-up job balloon into a multi-million dollar pollution incident.  The failure to provide immediate notice precludes coverage for the liabilities, costs and expenses related to the vessel's subsequent sinking.

The parties to a marine insurance contract are held to the highest degree of good faith. River Marine breached its duty of utmost good faith when it misrepresented that safety and maintenance were a high priority; and failed to disclose, among other things, the vessel's deteriorated and dilapidated condition after having been laid up unused, unmaintained and subject to the elements for nearly a decade.  River Marine's failures in this regard voids the Safe Harbor Policy *ab initio*.

Plaintiffs move pursuant to F.R.C.P. 56 for summary judgment on its claims that River Marine breached the express warranty, failed to provide timely notice, and breached its duty of utmost good faith (First, Second and Fourth Causes of Action); and for the same reasons the Intervenor Counterclaims must be dismissed.  Plaintiffs also move for summary judgment dismissing the Counterclaims of Western River Assets and Gate City River Transportation because they are not seeking coverage in this litigation.  Finally, Plaintiffs' move pursuant to F.R.C.P. 12(c) to dismiss River Marine's bad-faith counterclaim and request for punitive damages.

# FACTUAL BACKGROUND[1]

## I.    The Policy

At all relevant times, defendant River Marine Enterprises, LLC ("River Marine") was a towboat operator in the Ohio River and its tributaries.  *See*, Ex. 1, Smith Tr. 31:2-33:17.[2]  On July 14, 2015, Safe Harbor Pollution Insurance ("Safe Harbor") was asked by Ash Group, River Marine's insurance broker, to provide River Marine with a quote for pollution liability coverage.[3] Ex. 2, McCain. Tr. 15:22-16:5, 24:22-25:5, 26:6-13; Ex. 9, Brown Decl.¶¶ 1, 4.   For its consideration, Ash Group provided Safe Harbor with a corporate profile of River Marine, the current vessel schedule, which included the towboat GATE CITY, and prior loss runs.  Ex. 2, McCain Dep. Tr. 28:6-20; Ex. 28, Ash 000001-Ash 000009; Ex. 9, Brown Decl. ¶ 6.  These documents led Safe Harbor to believe that River Marine was owned and managed by an individual (Captain David Smith) who had a substantial amount of experience operating towboats; and that safety and maintenance of their vessels was a high priority, which River Marine claimed to take seriously.  Ex. 9, Brown Decl. ¶ 6.  The reality, however, was the exact opposite.  As it relates to the GATE CITY, River Marine allowed the vessel to fall into such a state of disrepair and deterioration that it was taking on water, posed a substantial threat of pollution and could never be put back in service.  Ex. 7, Opp Dep. Tr. 146:16-147:7; Ex. 19, December 5, 2017 USCG Administrative Order; Ex. 15, Dolan Report at pp. 7-10.

---

[1] The factual background provided herein includes both the facts material to Plaintiffs' motion for summary judgment and general background facts.  The material facts are those stated in Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(a).

[2] Unless noted otherwise, all "Ex. __" references are to the exhibits attached to the Russell Declaration.

[3] Safe Harbor is a syndicate of insurance companies, including Starr Indemnity & Liability Company, Argonaut Insurance Company and Berkshire Hathaway Specialty Insurance Company. Ex. 9, Declaration of Russell Brown ("Brown Decl.") ¶ 2.

Unfortunately, Safe Harbor only came to learn of these facts after the GATE CITY finally sank during the night hours of January 9 and 10, 2018.  Ex. 10, Quinn Decl. ¶ 6;  Ex. 9, Brown Decl. ¶¶ 14-15.

Without the knowledge of these material facts; and based on the misrepresentation that River Marine was a prudent and safe operator, Safe Harbor agreed to insure the GATE CITY on a Port Risk basis for the period of August 1, 2015 to August 1, 2016 (Policy No. V-13970-15).  Ex. 9, Brown Decl. ¶¶ 4, 10.  This policy was renewed for another two years - Policy Nos. V-13970-16 and V-13970-17. Ex. 9, Brown Decl. ¶¶ 11 and 12.  During these renewals, the GATE CITY continued to be insured on a Port Risk basis because at the time it was not unusual that 1 or 2 vessels in a fleet be laid up for 1-3 years due to a lack of work. *Id*.  The claim at issue in this litigation involves Safe Harbor Policy No. V-13970-17 (hereinafter referred to as the "Safe Harbor Policy").

## II.    The GATE CITY

The GATE CITY was built in 1956 and was 125 feet in length with an operating draft of 7 feet. Ex. 1, Smith Tr. 59:13-60:4.  Purchased in September 2007, the vessel stopped being used less than a year later in August 2008.  Ex 1, Smith Dep. Tr. 49:3-14, 69:16-70-19, 95:2-6.  At that point, sections of the underwater hull plating were already in need of replacement. Ex. 15, Dolan Report at p. 3-4.  River Marine never used the vessel again – nor did it undertake any efforts to maintain the vessel.  Ex. 4, Crivici Tr. 56:25-57:8; Ex. 11, Ex. A to the Declaration of Wayne Thomas ("Thomas Report") pp. 20, 31; Ex. 15, Dolan Report pp. 7-8, 10. It was simply left to deteriorate in the elements – and that it did. Ex. 7, Opp Dep. Tr. 146:16-147:7; Ex. 11, Thomas Report at pp. 14-19, 21-31, Exs. B, C and D to Thomas Decl; Ex. 15, Dolan Report pp. 6-10.

In 2016, the vessel began taking on water, which would need to be pumped out every week. Ex. 3, Keeton Tr. 103:12-105:14; Ex. 4, Crivici Tr. 76:23-77:6; Ex. 26, Keeton Statement.  River

Marine never investigated why the vessel was taking on water nor did it effectuate any repairs to stop it from happening. Ex. 5, Keeton Tr. 107:13-15, 108:6-15; Ex. 1, Smith Tr. 108:11-15,182:23-183:3, 183:10-15.

## III.    The Administrative Order

On December 4, 2017, the USCG contacted River Marine to advise that the GATE CITY (and another River Marine vessel – the ANNA C) was showing signs of taking on water; and that they determined that both vessels posed a substantial threat of oil discharge. Ex. 20, RME 521. The next day, the USCG issued an Administrative Order to River Marine directing it to remove all oil from the GATE CITY (and ANNA C). Ex. 21, December 5, 2017 USCG Administrative Order.

Although the Safe Harbor Policy requires immediate notice of an Occurrence, River Marine never advised Safe Harbor that the GATE CITY (and ANNA C) was taking on water; and it had been Ordered to remove all oil. *See* R. Doc. 9-1 at pp. 34-35 of 41; Ex. 1 Smith Tr. 206:13-22; Ex. 10, Declaration of Sean Quinn ("Quinn Decl.") ¶ 9. This prevented Safe Harbor from taking steps to assist in the mitigation of the substantial threat of oil discharge, which among other things, includes the hiring of a spill response manager who would have ensured the prompt clean-up of the GATE CITY (and ANNA C) and/or placement of a boom to contain any spill. Ex. 10, Quinn Decl. ¶ 4, 11, 12, 13; Ex. 13, Expert Report of Chuck Dutill at pp. 3, 10 of 17.

Furthermore, apart from obtaining a quote from Safety Kleen (an environmental clean-up contractor) in the amount of $4,500, River Marine did nothing further to comply with the USCG's Order to remove the oil from the GATE CITY (and ANNA C) – even though it was required to do so and Safety Kleen was ready willing and able to move on 24 to 48 hours notice. Ex. 1, Smith Dep. Tr. 200:22-201:12; Ex. 27, RME 1617; Ex. 8, Deposition Transcript of Minor Shank ("Shank Tr.") 48:1-6, 52:21-53:3.

**IV.    The Sinking of the GATE CITY and Subsequent Investigation**

The GATE CITY sank during the night hours between January 9 and 10, 2018.  Surveys of the vessel after it had been refloated and hauled out, including by River Marine's own surveyor, found the GATE CITY in a complete state of disrepair, the hull was severely compromised by substantial corrosion in the form of holes, pitting, rust blistering and thinning of shell plating.  Ex. 4, Crivici Dep. Tr. 36:11-37:7, 54:23-55:10; Ex. 15, Dolan Report at pp. 5-6, Ex. 11, Thomas Report at pp. 21-31, Exs. B, C and D to Thomas Decl;  Ex. 7, Deposition Transcript of Ed Opp ("Opp Dep. Tr.") 146:16-147:7; Ex. 5, Grieb Dep. Tr. 74:7-14.  In addition, the vessel's engine room was found to be in total disarray with multiple systems, their components, pipelines, cable connections, controls and service pumps either disconnected, removed, partially missing and/or in various stages of disassembly or dismantlement.  Ex. 11, Thomas Report at p.14-19, 31.

<u>**ARGUMENT**</u>

<u>**POINT I**</u>

<u>**SUMMARY JUDGMENT STANDARD**</u>

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact; and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  "When the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show that there is some metaphysical doubt as to material facts … Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

## POINT II

### THIS DISPUTE IS GOVERNED BY MARITIME LAW OR IN ITS ABSENCE, NEW YORK LAW

This action involves the application and interpretation of a marine insurance contract. *See*, *Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.*, 413 F.3d 307, 321 (2d Cir. 2005)("Pollution coverage is widely recognized as marine in nature."); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 637, 2016 A.M.C. 1217, 2016 WL 2943139 (2d Cir. 2016)(holding that an insurance policy which covered liability for marine pollution liability was a "marine insurance policy, subject to our admiralty jurisdiction and federal maritime law, including the doctrine of uberrimae fidei."). "A marine insurance contract is governed by maritime law and thus invokes federal jurisdiction." *Insurance Co. of N. Amer. v. Zaglool*, 526 F. Supp. 2d 361, 365 (E.D.N.Y. 2007); *see also*, *Starr Indem. & Liab. Co. v. Marine Env't Remediation Grp., LLC*, No. 17-CV-9881(LGS), 2018 WL 3611970, at *3 (S.D.N.Y. July 27, 2018)(holding that coverage dispute regarding whether pollution policy covered oil spill from sunken vessel fell within the Court's maritime jurisdiction).

"Absent a specific federal rule, federal courts look to state law for principles governing maritime insurance policies…and apply federal maritime law choice of law principles to determine which state law applies." *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir. 1999). Where a marine insurance policy designates that a specific jurisdiction's law will apply to the interpretation of that policy, the choice of law provision is enforceable unless that jurisdiction has no substantial relationship between the parties or the law of the jurisdiction conflicts with the fundamental purposes of maritime law. *See*, *Farrell Lines, Inc. v. Columbus*

7

*Cello-Poly Corp.*, 32 F. Supp. 2d 118, 127 (S.D.N.Y. 1997).  Here, the Safe Harbor Policy contains a choice of law provision which provides that "[t]he law applicable to the interpretation of this Policy of insurance…shall be federal maritime law or, in the absence of federal maritime law, the law of the State of New York, without regard to Federal or New York's choice of law or conflicts of law rules or principles." *See*, R. Doc. 9-1 at p. 34 of 41.  Thus, to the extent federal maritime law does not apply to the issues in this dispute, New York law should apply because it has a substantial relationship to the parties. At all relevant times, Safe Harbor Pollution Insurance, including the underwriter and claims adjuster, and Starr Indemnity & Liability Company were based in New York. *See*, R. Doc. 9 ¶¶ 4, 7.  Further, New York law does not conflict with federal maritime law on the issues herein.

Under New York law, "insurance policies are interpreted according to the general rules of contract interpretation." *Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 147 (2d Cir. 2017). "[A]n insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006).  "When the provisions are unambiguous and understandable, courts are to enforce them as written." *Id*.  Summary judgment is proper where contractual provisions "convey a definite and precise meaning absent any ambiguity."  *Seiden Assocs., Inc. v. ANC Holdings*, 959 F.2d 425, 428 (2d Cir. 1992).

## POINT III

### THE SAFE HARBOR POLICY WAS VOID AT THE TIME THE GATE CITY SANK AS RIVER MARINE FAILED TO COMPLY WITH AN EXPRESS WARRANTY IN THE POLICY TO EXERCISE DUE DILIGENCE TO MAINTAIN THE VESSEL IN A SEAWORTHY CONDITION

**A.    The Safe Harbor Policy Contains an Express Warranty which if Breached Voids the Policy as a Matter of Law and as a Matter of Contract**

In the First Cause of Action, Plaintiffs contend that the Policy was void at the time the GATE CITY sank because River Marine did not exercise due diligence to maintain the vessel in a seaworthy condition. *See*, R.Doc. 9, Amended Complaint ¶¶ 40-47.  There is no genuine dispute that River Marine failed to perform necessary and required maintenance to maintain the GATE CITY in a seaworthy condition and, therefore, Safe Harbor is entitled to judgment as a matter of law.

The Safe Harbor Policy's "General Terms, Conditions, and Limitations" contains an express warranty under which River Marine "warranted … that, after the inception of the Policy," it "shall at all times use due diligence to maintain [the GATE CITY] in a seaworthy condition." *See*, R. Doc. 9-1 at p. 24 of 41.  Under the same "General Terms, Conditions and Limitations," the Safe Harbor Policy provides that:

> (b)    The Insured's breach of any warranty, express or implied, contained in this Policy shall immediately void this Policy as of the time of the breach and no claim shall be paid under this Policy for losses arising after the breach.  The Company may, at its sole discretion, continue coverage provided that (i) it has received written notice of the breach from the Insured, and (ii) the Insured has paid any additional premium as the Company may require and the Company has confirmed in writing that coverage is continued.

Id.

"[W]arranties in maritime insurance contracts must be *strictly complied with*, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to recover." *Commercial Union Ins. Co. v. Flagship Marine Services, Inc.,* 190 F.3d 26, 31 (2d Cir. 1999) (citation omitted) (emphasis added).  "The rule of strict compliance with warranties in marine insurance contract stems from the recognition that it is peculiarly difficult for marine insurers to assess their risk, such that insurers must rely on the representations and warranties made by insureds regarding their vessels' condition and usage." *Id.* at 31-32.

In recognition of this reliance by marine insurers on these representations and warranties made by insureds regarding marine risks, New York Insurance Law has carved out a special exception from the general rule that a breach of a warranty does not preclude recovery under a policy of insurance. *See*, N.Y. Ins. Law § 3106(c)("This section shall not affect the express or implied warranties under a contract of marine insurance with respect...any and all risks or perils of navigation, transit, or transportation, including war risks, on, over or under any seas or inland waters ...."). Under New York law, express promissory warranties in marine insurance contracts must be "literally complied with, and that noncompliance forbids recovery, *regardless of whether the omission had causal relation to the loss*." *Jarvis Towing & Transp. Corporation v. Aetna Ins. Co.,* 298 N.Y. 280, 282, 82 N.E.2d 577, 577 (N.Y. 1948) (emphasis added); *see also*, *Commercial Union*, 190 F.3d at 31 ("As a general matter, warranties represent a promise by the insured to do or not do some thing that the insurer considers significant to its risk of liability under an insurance contract.").

Courts interpreting marine insurance warranties under New York law have routinely enforced these warranties to preclude recovery under a policy of marine insurance. *See*, *Jarvis*, 298 N.Y. 280, 284 (failure of vessel owner to have watchman make inspections of the vessel at frequent intervals in violation of express warranty precluded recovery under policy, even if the breach of the warranty was casually unrelated to vessel sinking); *Levine v. Aetna Ins. Co.*, 139 F.2d 217, 218 (2d Cir. 1943)(recovery under protection and indemnity policy precluded where insured breached an express warranty to maintain a searchlight on the vessel, regardless of whether the absence of a searchlight was the cause of the drowning of a passenger); *see also*, *Insurance Co. of N. Amer. v. Zaglool*, 526 F. Supp. 2d 361 (E.D.N.Y. 2007) (insurance policy would not

provide coverage for mechanic operating vessel which resulted in injuries where insured warranted that coverage would only apply when owner was operating vessel).

It is well-settled under New York law that express warranties require "strict performance" and that any breach precludes recovery under the policy regardless of the cause of the ultimate loss as a matter of law.  *Kron v. Hanover Fire Ins. Co.*, 20 A.D.2d 670, 670-71, 246 N.Y.S.2d 848, 849-50 (N.Y. App. Div. 1964).

Additionally, and as a matter of contract, the Safe Harbor Policy *expressly* provides that River Marine's breach of any express warranty (e.g., the warranty to exercise due diligence to maintain the GATE CITY is a seaworthy condition) immediately voids the Policy.  *See*, R. Doc. 9-1 at p. 24 of 41.  The Safe Harbor Policy's express and unambiguous provision that River Marine's breach of the warranty to maintain the GATE CITY in a seaworthy condition must be enforced as written to give full effect to the intent of the parties as written.  *See*, *Parks*, *supra*, 472 F.3d at 42.

### B.    The GATE CITY Was Unseaworthy Prior to Sinking

Seaworthiness is "the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes." *McAllister Lighterage Line, Inc. v. Ins. Co. of N. Am.*, 244 F.2d 867, 870 (2d Cir. 1957).  The standard for seaworthiness "is not perfection but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suited for her intended service." *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 322, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964).  The meaning of seaworthy is "relative -- it varies with the vessel involved and the use for which the vessel is intended." *Fed. Ins. Co. v. PGG Realty, LLC*, 538 F. Supp. 2d 680, 693 (S.D.N.Y. 2008).  Substantial defects in a vessel's hull or a vessel's machinery may render the

vessel unseaworthy as a matter of law. *See*, *e.g.*, *Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa.*, 247 F. 2d 116, 120 (5th Cir. 1957)("Of course, a defect in machinery or a defect in a hull means that the vessel is thereby unseaworthy since, with such defect, the machinery or hull, cannot comply with the classic definition of 'reasonably suited' for the purposes intended.").

River Marine intended that the GATE CITY remain moored in the Big Sandy River while laid up. The seaworthiness of the vessel should therefore be measured against River Marine's intentions. More specifically, in order to be seaworthy, the GATE CITY needed to remain watertight and be able to withstand normal and reasonably expected weather and river conditions.

The following facts, which are not in dispute, establish that the GATE CITY was unseaworthy at the time of its sinking on the Big Sandy River:

- The hull of the GATE CITY was severely compromised by overall corrosion, significant wastage, multiple corrosion holes and blistering and thinking of the shell plating;
- The GATE CITY's port and starboard skin coolers, used for the diesel generator engines, were completely wasted, deteriorated and non-functioning;
- The GATE CITY's engine room was in total disarray with multiple systems and their components (pipelines, cable connections, control and service pumps) either disconnected, removed, partially missing or in various stages of disassembly or dismantlement;
- The GATE CITY has been taking on least three to four inches of water, but as much as 24 inches of water, out of the void every week from 2016 until the day prior to the sinking of the GATE CITY in January 2018;

River Marine's own expert in this litigation does not dispute that these conditions existed at the time of the sinking. Moreover, River Marine's own surveyor hired to assist the company after the sinking of the GATE CITY admitted that the vessel was in a "complete state of disrepair" at the time of the sinking. Given the condition of the vessel's hull and machinery, the GATE CITY was clearly not fit for its intended purpose (being laid up on Port Risk on the Big Sandy River).

### C.    River Marine Did Not Exercise Due Diligence to Maintain the GATE CITY

The following undisputed facts, individually or collectively, show that River Marine failed

to use due diligence to maintain the GATE CITY in a seaworthy condition:

- River Marine did not drydock the vessel between 2008 and the date of the subject sinking in January 2018 to inspect the vessel's hull or perform any hull gaugings despite the fact that the vessel's hull was already exhibiting 30% wastage or corrosion on a number of the vessel's bottom plating at the time of the vessel's purchase in 2007;
- River Marine did not have any loss control measures in place including bilge and high water alarms, freeze protections or a dewatering log between 2007 and the date of the subject sinking in January 2018 despite the vessel exhibiting 30% wastage or corrosion on a number of the vessel's bottom plating at the time of the vessel's purchase;
- River Marine did not perform any hull maintenance on the GATE CITY, nor did it take any protective measures designed to preserve the structural integrity of the vessel's hull while the vessel was laid up on the Big Sandy River from 2008 and the date of the subject sinking in January 2018;
- River Marine did not apply any protective paintings, coatings and zinc anodes to help fight against corrosion of the vessel's hull between 2008 and the date of the subject sinking in January 2018;
- River Marine did not have any set maintenance schedule for the GATE CITY nor did it perform any monthly safety inspections or annual audits on the vessel as described in the RME Operations Manual;
- River Marine did not make any repairs to address three to four inches, but as much as twenty-four inches of water, which was entering a void on the vessel every week from 2016 until the date of the subject sinking in January 2018;
- River Marine did not take the minimum accepted actions to preserve and maintain the GATE CITY (a laid up vessel on the Big Sandy River) including maintaining sufficient, qualified personnel available to maintain fire, leakage, mooring and a security watch for the vessel; fire safety equipment in good order in case of need; a working fire pump; a working bilge pump; power available for the fire pump and bilge pump; and preservation of the vessel's machinery with respect to future use; and examinations of the vessel's hull.

"[A] particular set of facts supporting an inference of unseaworthiness may also support an inference of negligence." *U.S. v. Banda Boats, Inc.*, 990 F.2d 626 (5th Cir. 1993) (citation omitted)(finding barge owner was negligent where it never inspected the barge's internals). Plaintiffs submit that the above set of facts supports an inference of negligence.

## POINT IV

### RIVER MARINE FAILED TO PROVIDE TIMELY NOTICE OF AN OCCURRENCE WHICH VITIATES COVERAGE UNDER THE POLICY

Safe Harbor alleges in its Fourth Cause of Action that River Marine failed to provide immediate notice of a December 5, 2017, United States Coast Guard Administrative Order as

13

required by the Safe Harbor Policy. *See*, R. Doc. 9, Amended Complaint ¶¶ 59-63.  In a December 5th Order, the Coast Guard determined that the GATE CITY posed an imminent and substantial threat of a discharge of oil because the GATE CITY was taking on water.[4]  This Administrative Order constituted an Occurrence under the Safe Harbor Policy and River Marine failed to notify Safe Harbor of the Order prior to the January 9/10, 2018, sinking of the vessel.  Under New York law, River Marine's obligation to immediately notify Safe Harbor of the Order was a condition precedent to coverage.

### A.  Section 3420 of New York Insurance does not Apply to this Marine Insurance Contract

In 2008, the New York legislature abrogated the common-law "No Prejudice"[5] rule and amended New York Insurance Law section 3420 to provide that "[a] provision that failure to give any notice required to be given by such policy within the time prescribed therein shall not invalidate any claim made by the insured, injured person or any other claimant, unless the failure to provide timely notice has prejudiced the insurer …."  N.Y. Ins. Law § 3420(a)(5).  The statute further provides that where an insurer claims a defense of late notice, the burden is on an insurer to establish prejudice if notice is provided by an insurer within two years of the time required under the policy.  N.Y. Ins. Law § 3420 (c)(2)(A).

Section 3420, however, does not apply to "'the kinds of insurance set forth in paragraph three of subsection (b) of section two thousand one hundred seventeen of this chapter.'" *Progressive Northeastern Ins. Co. v. American Ins. Co.*, No. 99-CV-8998 (SHS), 2001 WL

---

[4] The Administrative Order also stated that another River Marine vessel – the ANNA C – also posed a substantial threat of discharge of oil because it too showed signs of taking on water.

[5][5] As discussed in greater detail in Point IV.B, under New York common-law, "the notice provision for a primary insurer operates as a condition precedent [to coverage] and … and the insurer need not show prejudice to rely on the defense of late notice."  *Unigard Sec. Ins. Co., Inc., v. North River Ins. Co.*, 79 N.Y.2d 576, 594 N.E.2d 571, 573 (N.Y. 1992) (citations omitted).

959183, at *3 (S.D.N.Y. Aug. 21, 2001) (quoting N.Y. Ins. Law § 3420(i)).  "One such type of insurance set forth in [section 2117] is 'insurance in connection with ocean going vessels against any of the risks specified in paragraph twenty-one of subsection (a) of section one thousand one hundred thirteen of this chapter.'"  *Id.* (quoting N.Y. Ins. Law § 2117(b)(3)(B)).  Paragraph 21 of section 1113, in turn, excludes "marine protection and indemnity insurance" which insures against "legal liability of the insured for loss, damage or expense arising out of, or incident to, the ownership, operation, chartering, maintenance, use, repair or construction of any vessel in use in ocean or inland waterways …." N.Y. Ins. Law § 1113(a)(21).  In sum, section 3420's requirement that an insurer demonstrate prejudice from late notice excludes maritime insurance contracts for maritime policies which insure ocean going vessels. *See*, *N.Y. Marine & Gen. Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 485 F. Supp. 3d 398, 404 (S.D.N.Y. 2020).

"The determination of whether a vessel is an 'ocean going vessel' is made by reference to the 'express geographic limits expressed in the Declarations portion of the Policy,' rather than to the factual 'ocean going capabilities of the particular vessel.'" *Id.* (quoting *DeGeorge v. ACE Am. Ins. Co.*, No. 07-CV-2761, 2008 WL 180786, at *5 (S.D.N.Y. Jan. 17, 2008); *see also, Ins. Co. of N. Am. v. Zaglool*, 526 F. Supp. 2d 361, 366 (E.D.N.Y. 2017)("Whether a vessel in an ocean going vessel depends not on the capabilities of a particular vessel, but rather on the relevant policy's 'Policy Territory.'").  The Declarations Page of the Safe Harbor Policy at issue in this litigation provides that the River Marine's Navigation Limits was "World Wide."  *See*, R. Doc. 9-1, Safe Harbor Policy at p. 12 of 41.  Moreover, the Policy provided pollution insurance coverage for certain International Conventions; and also listed an international spill response number so an insured could receive prompt assistance for international pollution incidents. *See*, *id*. at pp. 6-7 of

41.  Clearly, the Safe Harbor Policy provides coverage for ocean going vessels as it has unlimited "World Wide" coverage and, thus, does not fall within the ambit of Section 3420.

Even if the Court were to consider River Marine's warranty in the Safe Harbor Policy that it would operate its vessels "within the navigational limits identified in the Hull or P&I policy insuring each vessel …[,]" (*see*, R. Doc. 9-1, Safe Harbor Policy at p. 24 of 41) this does not change the fact that Safe Harbor Policy is designed to give expansive "World Wide" coverage to an insured which *may* be limited by other insurers (i.e., the Hull or P&I insurers).

Moreover, the navigational limitations in River Marine's P&I Policy provide further support that Section 3420 of New York Insurance Law should not apply to this dispute.  In the P&I Policy, River Marine warranted that its vessels would operate in certain inland waterways, none of which included any waterways in New York State.  Ex. 18, at ASH003400.

Section 3420 only applies to liability insurance policies which are "issued or delivered" in New York.  A policy is "issued or delivered" in New York whenever the policy covers "insureds and risks located in [New York] state."  *Carlson v. American Intern. Group, Inc.*, 30 N.Y.3d 288, 305-06, 89 N.E.3d 490, 500-01 (N.Y. 2017) (holding that "issued or delivered" in New York under section 3420 should be read to protect insured risks in the state given the remedial purpose of the statute).  River Marine's P&I Policy did not cover an insured located in New York, nor did it even cover risks located in New York.  Even assuming that the Safe Harbor Policy is not considered an "ocean-going" marine insurance by virtue of the territorial limitation in the P&I Policy, the P&I Policy does not cover risks in New York, and thus, does not fall within the ambit of section 3420.

## B.    New York's Common-Law "No Prejudice" Rule Applies to the Safe Harbor Policy and River Marine Failed to Provide Timely Notice of an Occurrence

Because New York Insurance Law section 3420 does not apply to the Safe Harbor policy, New York's common-law no prejudice rule for insurance contracts should be applied in this case.

16

*See*, *Indian Harbor Ins. Co v. City of San Diego*, 972 F. Supp. 2d 634, 650 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 726 (2d Cir. 2014); *N.Y. Marine & Gen.*, *supra*, 485 F. Supp. 3d at 407.  Under New York common-law, "the notice provision for a primary insurer operates as a condition precedent [to coverage] and … and the insurer need not show prejudice to rely on the defense of late notice." *Unigard Sec. Ins. Co., Inc., v. North River Ins. Co.*, 79 N.Y.2d 576, 594 N.E.2d 571, 573 (N.Y. 1992)(citations omitted).  "[T]he absence of timely notice of an occurrence is a failure to comply with a condition precedent which, as a matter of law, vitiates the contract." *Argo Corp. v. Greater N.Y. Mut. Ins. Co.*, 4 N.Y.3d 332, 339, 827 N.E.2d 762, 764 (N.Y. 2005)(citation omitted).

The "Notice" provisions in the Safe Harbor Policy provides:

## CHAPTER 7

## NOTICE

### SECTION 1: NOTICE TO THE COMPANY

(a)      IN THE EVENT OF ANY OCCURRENCE OR INCIDENT WHICH MAY GIVE RISE TO A CLAIM UNDER THIS POLICY, THE INSURED SHALL GIVE IMMEDIATE NOTICE OF SAID OCCURRENCE OR INCIDENT TO THE COMPANY
*** 
(d)      It is essential that the Insured provide the Company with immediate notice of the occurrence of any incident which is potentially covered by this Policy and/or which the Insured may have liability or as to which the Insured may be required to enter a defense

(e)      LIMITATION TO DUE FAILURE TO NOTIFY:  The Company will not have any exposure or liability under this Policy if, for lack of immediate notice an incident is made worse or more extensive because the Company was unable, for lack of immediate notice, to undertake effective managerial or remedial measures

R. Doc. 9-1, Safe Harbor Policy at pp. 34-35 of 41.

Under New York common-law, where a policy requires an insured to notify an insurer immediately of an occurrence, courts will strictly enforce the notice provision to require an insured to give notice without delay. *See*, *M.Z. Discount Clothing Corp. v. Meyninger*, 23 F. Supp. 2d 270, 272 (E.D.N.Y. 1998)(where a policy "requires immediate notification, a delay of more than 10

days in considered unreasonable" under New York law); *see also*, *Mark A. Varrichio & Assocs. v. Chi. Ins. Co.*, 312 F.3d 544, 547 (2d Cir. 2002)(under New York law, "where a policy has an immediate notice of suit requirement, even a relatively short delay in providing notice violates that requirement."); *Travelers Indem. Co. v. Northrop Grumman Corp.*, 413 F. Supp. 3d 290, 296 (S.D.N.Y. 2019)(a short delay in providing notice of an occurrence violates a notice requirement).

Even where a policy requires that an insured give notice as soon as practicable or within a reasonable time, relatively short delays will violate the notice requirement. *See*, *Indian Harbor*, 586 F. App'x 726, 729 (2d Cir. 2014)("Under New York law, delays of even one or two months are routinely held unreasonable."); *Government Employees Ins. Co. v. Elman*, 40 A.D.2d 994, 338 N.Y.S.2d 666 (N.Y. App. Div. 1972)(delay of 29 days unreasonable as a matter of law where policy provided insured was required to provide notice "within 24 hours or as soon as reasonably possible"); *Vanderbilt v. Indemnity Ins. Co.*, 265 A.D. 495, 496 (N.Y. App. Div. 1943)(delay of 28 days precluded coverage where notice was to be provided "as soon as practicable").

An insured's notice obligation arises when "the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." *Indian Harbor*, 586 F. App'x 726, 729 (2d Cir. 2014). "Whether an insured's notice is timely depends on (1) when the insured's notice obligation arose and (2) whether the insured promptly gave notice within the timeframe of the policy." *New York Marine & Gen.,* 485 F. Supp. 3d at 406 (citation omitted). "Whether a delay is reasonable is an issue of fact, but courts may find a delay unreasonable as a matter of law if no excuse is given or if the excuse is not credible." *Id*.

Late notice may be excused where an insured has "lack of knowledge that an accident has occurred" or a "reasonable belief in nonliability." *Travelers Indem. Co. v. Northrop Grumman Corp.*, 413 F. Supp. 3d 263, 273-74 (S.D.N.Y. 2019). While the sufficiency of an excuse may

present an issue of fact to be determined by a jury, "the issue of whether an insured's excuse for delay is reasonable may be determined as a matter of law where the evidence, construing all inferences in favor of the insured, establishes that the belief was unreasonable or in bad faith." *Id.* (quoting *Rockland Exposition, Inc. v. Marshall Sterling Enters., Inc.*, 130 A.D.3d 1095, 31 N.Y.S.3d 139, 143 (N.Y. App. Div. 2016)).

In cases involving policies of insurance which cover environmental or pollution risks, courts have found that an insured's notice requirement arises as soon as it learns of potential liability. In *Travelers*, the court noted that Grumman's obligation to notify its insurer "as soon as practicable" of an occurrence arose as soon as Grumman learned from regulators that groundwater may be contaminated which could cause health issues. *Id.* at 271, 276 (noting that Grumman's obligation to notify its insurer arose in June 1976 when it received an EPA report that same month which potentially exposed Grumman to liability); *see also*, *Olin Corp. v. Ins. Co. of N. Am.*, 966 F.2d 718, 724 (2d Cir. 1992)(noting that an insured had knowledge of an occurrence due to DDT contamination at its plant long before lawsuits were filed related to that contamination).

Here, it is undisputed that River Marine **never** notified Safe Harbor of the Coast Guard's December 5, 2017 Administrative Order which required the removal of fuel from the GATE CITY and which constituted an Occurrence under the Safe Harbor Policy. River Marine's failure to notify Safe Harbor of the Coast Guard's Order violated the Safe Harbor Policy's requirement of immediate notice. Under New York law, River Marine's failure to notify Safe Harbor of the Coast Guard Order, despite its knowledge that the Order subjected River Marine to liability under the Oil Pollution Act of 1990, constitutes a violation of a condition precedent to coverage and vitiates coverage for the January 2018 pollution incident as a matter of law. *See*, *Argo*, 4 N.Y.3d at 336.

**C.     Even if Safe Harbor is Obligated to Demonstrate Prejudice by River Marine's Late Notice of the Administrative Order, Safe Harbor has been Materially Prejudiced as a Matter of Law**

"Notice-of-occurrence provisions have several purposes.  They enable insurers to make a timely investigation of relevant events and exercise early control over a claim.  Early control may lead to a settlement before litigation and enable insurers to take steps to eliminate the risk of similar occurrences in the future.  When insurers have timely notice of relevant occurrences, they can establish more accurate renewal premiums and maintain adequate reserves." *Com. Union Ins. Co. v. Int'l Flavors & Fragrances, Inc.*, 822 F.2d 267, 271, 56 USLW 2037 (2d Cir. 1987).  Notice provisions to aid an insurer in "ending or correcting dangerous conditions."  *Olin Corp.*, 966 F.2d at 723.

An insurer is prejudiced by late notice if it is unable to undertake any meaningful investigatory steps after an occurrence. *See, Atlantic Cas. Ins. Co. v. Value Waterproofing*, *Inc.*, 918 F. Supp. 243, 255-56 (S.D.N.Y. 2013)(insured's failure to notify insurer of building collapse until six months after the incident prejudiced insurer when the building had been demolished prior to notice); *See also*, *State of N.Y. v. Blank*, 27 F.3d 783, 796 (2d Cir. 1994)("The opportunity to conduct such investigation…is the very reason for the notification requirement.").  Late notice also prejudices an insurer where the insurer is unable to take "any steps to mitigate its liability and protect its interests." *Chrysler First Financial Servs. Corp. of Am. v. Chicago Title Ins. Co.*, 226 A.D.2d 183, 184, 641 N.Y.S.2d 13 (N.Y. App. Div. 1996).

Even if Safe Harbor is obligated to demonstrate that River Marine's failure to notify Safe Harbor of the December 5, 2017 Administrative Order, the prejudice here is clear.  As a result of River Marine's failure, Safe Harbor was unable to take standard measures, including hiring a spill response manager to assist River Marine in responding to the Coast Guard Order.  Safe Harbor's spill response manager would have coordinated with an Oil Spill Response Organization

("OSRO") to ensure a prompt cleanup of the GATE CITY. The spill response manager could have also, at a minimum, arranged for protective absorbent boom to be placed around the GATE CITY to ensure that a substantial majority of the oil was kept out of the general flow of the Big Sandy River.

Further, River Marine's own actions demonstrate the substantial prejudice to Safe Harbor due to River Marine's failure to provide notice of the Administrative Order. River Marine obtained a $4,500 estimate from Safety-Kleen to remove the oil from the GATE CITY (and the ANNA C). Despite Safety Kleen's ability to perform this work and, thus, prevent a major oil spill incident, River Marine never contracted with Safety Kleen to perform the oil removal. River Marine's failure to promptly notify Safe Harbor of the Order and caused this $4,500 clean-up expense to balloon into a multi-million dollar exposure which caused significant environmental damage. Safe Harbor's rights have been extensively prejudiced by River Marine's failure to provide immediate notice of the USCG Order.

## POINT V

### RIVER MARINE FAILED TO DISCLOSE MATERIAL FACTS CONCERNING THE INSURED RISK TO SAFE HARBOR AND SAFE HARBOR MAY VOID THE POLICY *AB INITIO* UNDER THE DOCTRINE OF *UBERRIMAE FIDEI*

Safe Harbor alleges in its Second Cause of Action that River Marine violated the maritime insurance doctrine of *uberrimae fidei* by misrepresenting and/or failing to disclose certain facts which materially affected the insured risk. *See* R. Doc. 9, Amended Complaint ¶¶ 48-53. River Marine's failure to disclose these material facts allows Safe Harbor to void the policies *ab initio*.

Under federal maritime law, "[i]t is well established that the parties to a marine insurance contract are held to the highest degree of good faith. Under this obligation, called *uberrimae fidei*, the party seeking insurance is required to disclose all circumstances known to him which materially affect the risk." *Puritan Ins. Co. v. Eagle S.S. Co.*, 779 F.2d 866, 870 (2d Cir. 1985). "If

the insured makes a material misrepresentation or omission, intentionally or otherwise, and the insurer relies on this misrepresentation, the policy may be voided *ab initio*." *RLI Ins. Co. v. JDJ Marine, Inc.*, No. 07 Civ. 9546, 2012 WL 3765026, at *4 (S.D.N.Y. Aug. 29, 2012). The "[f]ailure by the [insured] to disclose *all available information* will allow the insurer to avoid the policy regardless of whether such omission is intentional or results from mistake, accident, forgetfulness or inadvertence." *Firemen's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.,* 822 F.3d 620, 633 (2d Cir. 2016)(emphasis added).

"The standard for disclosure is an objective one, that is, whether a reasonable person in the assured's position would know that the particular fact is material." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986). "A non-disclosed fact is material if it would have affected the insurer's decision to insure at all or at a particular premium." *NY Marine & General Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 123 (2d Cir. 2001)

Courts have routinely held that an insured's failure to disclose that a vessel was in disrepair or that recommended maintenance was not being performed on a vessel are material facts which, if not disclosed by an insured, violate the doctrine of *uberrimae fidei*. *See*, *Fireman's Fund*, 822 F.3d at 637-40 (insurer could void marine pollution insurance policy where owner of drydock failed to disclose that drydock was substantially deteriorated and that insurer was not performing necessary and recommended repairs); *Gulfstream Cargo, Limited v. Reliance Ins. Co.*, 409 F.2d 974, 982-83 (5th Cir. 1969)(affirming trial court's finding an insurer was entitled to void marine insurance policy *ab initio* when insured failed to disclose that vessel leaked excessively, was in need of substantial repairs and was not fit for service); *Caitlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Services, Inc.*, 979 F. Supp. 2d 181, 190-191 (D.P.R. 2013), *aff'd as modified sub nom*. at 778 F.3d 69 (1st Cir. 2015)(marine insurer could avoid hull insurance policy

after sinking of drydock where insured failed to disclose long-term significant wastage and corrosion due to insured's poor maintenance and inspection procedures).

River Marine's Insurance Submission did not disclose that: the GATE CITY was laid up since 2008; had not been drydocked since 2008; was in a complete state of disrepair; had two main propulsion diesel engines in a state of disrepair and disassembly; had an engine room in poor condition and in total disarray with their systems, components, pipelines, cable connections, controls and service pumps either disconnected, removed, partially missing or/in various stages of disassembly or dismantlement; had significant and substantial hull wastage and deterioration; was taking on water since at least 2016; and has effectively had no maintenance since 2008 – in other words the vessel GATE CITY was a vessel that had been left unused, in disrepair and subject to the elements on the banks of the Big Sandy River for almost a decade before she ultimately sank on January 9-10.  All of these facts were material to risk and had any one these facts been disclosed to Safe Harbor, Safe Harbor would not have agreed to insure the GATE CITY.  *Id*.

Further, River Marine misrepresented to Safe Harbor that it placed a substantial importance on the safety and maintenance of their vessels, including the GATE CITY.  River Marine also misrepresented that the GATE CITY was on Port Risk (i.e., laid up due to a purported downturn in business), when, in reality, the GATE CITY was left on the banks of the Big Sandy River without any maintenance protocols and procedures to simply waste away.

## POINT VI

### RIVER MARINE'S CLAIM FOR BAD-FAITH COVERAGE DENIAL MUST BE DISMISSED AS A MATTER OF LAW

In its Answer and Counterclaims, River Marine asserts a cause of action against Safe Harbor for "Bad-Faith Coverage Denial."  *See* R. Doc. 25, River Marine Counterclaims ¶¶ 27-37. The Counterclaims also seek punitive damages from Safe Harbor. *Id*. at ¶ 37.

First, a "[m]ere difference of opinion between an insurer and an insured over the availability of coverage does not constitute bad faith; to show bad faith the insured must demonstrate that no reasonable carrier would, under the given facts deny coverage." *Jane Street Holding, LLC v. Aspen Amer. Ins. Co.*, No. 13-CV-2291(RWS), 2014 WL 28600 (S.D.N.Y. Jan. 2, 2014) (internal marks and citation omitted). Here, it is clear, that Safe Harbor had multiple, reasonable reasons for its denial of coverage, and River Marine's "bad faith" claim for "denial of coverage" dismissed.

Second, a cause of action for bad-faith adjustment of an insurance claim is only cognizable where an insured can show consequential damages due to an insurer's delay in adjusting a claim and which damages were within the contemplation of the parties to the insurance contract. *See*, *Scottsdale Ins. Co. v. McGrath*, No. 19-CV-07477, 2021 WL 3077578, at *13. Here, River Marine is simply seeking amounts which are purportedly owed for pollution clean-up liabilities, rather than consequential damages resulting from Safe Harbor's failure to pay amounts which River Marine allege are owed under the Safe Harbor Policy.

With respect to River Marine's claim for punitive damages, such damages are not available under New York law for a simple breach of contract. *Smith v. Lightning Bolt Prods.*, 861 F.2d 363, 371 (2d Cir. 1988) (collecting cases). Rather, punitive damages are limited to cases where the conduct is "'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree.'" *Id.* (quoting *Borkowski v. Borkowski*, 355 N.E.2d 287 (N.Y. 1976)). New York law also requires evidence of more than "an isolated transaction incident to an otherwise legitimate business" to support a claim for punitive damages. *Walker v. Sheldon*, 179 N.E.2d 497, 499 (N.Y. 1961); *see also Smith*, 861 F.2d at 371.

In the context of an insurance contract, punitive damages are not available unless the

insured shows both "egregious tortious conduct" directed at the insured and "a pattern of similar conduct directed at the public generally." *New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995); *see also Rocanova v. Equitable Life Assur. Socy. of U.S.*, 634 N.E.2d 940, 944 (N.Y. 1994). New York courts routinely dismiss claims for punitive damages in insurance cases where there has been no showing that the insurer "in its dealings with the general public, had engaged in a fraudulent scheme evincing such a high degree of moral turpitude and … such wanton dishonesty as to imply a criminal indifference to civil obligations." *Eccobay Sportswear, Inc. v. Providence Washington Ins. Co.*, 585 F. Supp. 1343, 1344 (S.D.N.Y.1984).

River Marine does not allege any "egregious tortious conduct" by Safe Harbor and a "pattern of similar conduct" directed at the general public. Therefore, River Marine's claim for punitive damages must also be dismissed as a matter of law.

## CONCLUSION

Plaintiffs' motion should be granted. Plaintiffs are entitled to summary judgment against River Marine on the First, Second and Fourth Causes of Action in the Amended Complaint. For the same reasons, Plaintiffs are entitled to summary judgment with respect to Intervenors' Counterclaims. *See*, *Federal Ins. Co. v. Arthur Anderson & Co.*, 75 N.Y.2d 366, 372, 553 N.Y.S.2d 291 (N.Y. 1990)(holding that it is well-settled that "the rights of the insurer as subrogee are derivative and limited to such rights as the insured"; and the claim of a subrogee is "subject to whatever defenses the third party might have asserted against the insured."). In addition, Plaintiffs are entitled to summary judgment on the Counterclaims of Western River Assets, LLC and Gate City River Transportation, LLC because they are not seeking coverage in this litigation. Finally, the Fourth Cause of Action of the River Marine's Counterclaims should be dismissed for failure to state a plausible claim.

Dated: New York, New York
       August 2, 2021

                              Respectfully submitted,

                              NICOLETTI HORNIG & SWEENEY
                              *Attorneys for Plaintiffs*

                    By:    S/ Guerric S.D.L. Russell
                           Guerric S.D.L. Russell
                           Patrick Nolan
                           Wall Street Plaza
                           88 Pine Street, Seventh Floor
                           New York, New York 10005
                           (212) 220-3830
                           grussell@nicolettihornig.com
                           pnolan@nicolettihornig.com