```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
SAFE HARBOR POLLUTION
INSURANCE, STARR INDEMNITY &
LIABILITY COMPANY, ARGONAUT
INSURANCE COMPANY and BERKSHIRE
HATHAWAY SPECIALTY INSURANCE
COMPANY,

              Plaintiffs,

        - against –

RIVER MARINE ENTERPRISES, LLC,
WESTERN RIVER ASSETS, LLC and
GATE CITY RIVER TRANSPORTATION,
LLC,

              Defendants.

        - and –

LIBERTY MUTUAL INSURANCE
COMPANY, NAVIGATORS INSURANCE
COMPANY, and ENDURANCE AMERICAN
SPECIALTY INSURANCE COMPANY,

              Intervenor
Counterclaim Plaintiffs.

------------------------------X
```

                                        **MEMORANDUM AND ORDER**

                                        18 Civ. 5942 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Safe Harbor Pollution Insurance, Starr Indemnity & Liability Company, Argonaut Insurance Company and Berkshire Hathaway Specialty Insurance Company (collectively, "plaintiffs" or "Safe Harbor") bring this action seeking judgment declaring that there is no coverage under the vessel pollution liability insurance policy (the "Policy") issued by Safe Harbor to defendant

River Marine Enterprises, LLC ("River Marine") for claims arising from the sinking of the vessel M/V GATE CITY ("GATE CITY").

Before the Court is Safe Harbor's motion for summary judgment and to dismiss River Marine's fourth counterclaim for failure to state a claim.  For the reasons stated below, we grant Safe Harbor's motion in its entirety.

**BACKGROUND**

**I.   Procedural Posture**

On July 2, 2018, plaintiffs filed the complaint in this action, which was later amended on July 10, 2018.  See ECF Nos. 7, 9.  The Amended Complaint requests the Court to enter judgment against River Marine, Gate City River Transportation, LLC ("GCRT"), and West River Assets, LLC (collectively "defendants"), declaring that: (1) the Policy was void when the GATE CITY sank because the GATE CITY was not seaworthy at that time and was not maintained in violation of an express warranty; (2) no coverage exists under the Policy because River Marine violated the doctrine of uberrimae fidei by failing to disclose material facts regarding the maintenance of the GATE CITY, rendering the Policy void ab initio; (3) no coverage exists under the Policy based on defendants' willful misconduct by failing to maintain the GATE CITY and failing to comply with the December 5, 2017 Administrative

Order issued by the Coast Guard to River Marine (the "Coast Guard Order"); (4) no coverage exists under the Policy because defendants failed to provide immediate notice of the Coast Guard Order as is required under the Policy; (5) no coverage exists under the Policy based on defendants' failure to comply with the Coast Guard Order and to mitigate the threat of discharge; (6) no coverage exists under the Policy because defendants failed to cooperate with plaintiffs during the investigation of the sinking of the GATE CITY, which prejudiced plaintiffs; (7) no coverage exists under the Policy because defendants incurred costs to mitigate the oil discharge without prior consent of plaintiffs; and (8) no coverage exists under the Policy for the amounts paid by defendants related to the clean-up of asbestos and pollutants, which are excluded under the Policy. See ECF No. 9 ¶¶ 40-82. Plaintiffs additionally request a declaratory judgment declaring that there is no coverage under the Policy related to expenses incurred by GCRT, as GCRT is not a named insured or additional insured. Plaintiffs also request a declaratory judgment declaring that there is no obligation to defend GCRT and West River Assets, LLC against a lawsuit filed by the City of Kenosha related to the sinking of the GATE CITY, since there is no coverage under the Policy. Id. ¶¶ 83-89.

On October 4, 2018, defendants filed an Answer along with

counterclaims.  See ECF No. 25.  Defendants asserted four causes
of action: breach of contract, declaratory judgment, unjust
enrichment, and bad faith coverage denial.  Id.  On February 12,
2019, Liberty Mutual Insurance Company, Navigators Insurance
Company, and Endurance American Specialty Insurance Company
(collectively, "intervenors") filed a motion to intervene, which
was granted on March 6, 2019.  See ECF Nos. 36, 45.  Intervenors
subsequently filed their own complaint, asserting claims of breach
of contract, declaratory judgment of plaintiff's obligations under
the Policy, and unjust enrichment.  See ECF No. 46.

Following the close of discovery on April 19, 2021, see ECF
No. 85, plaintiffs moved for summary judgment on the first, second,
and fourth requests for declaratory judgment in the Amended
Complaint, on all counterclaims, on all claims in the intervenor
complaint, and to dismiss the fourth counterclaim for failure to
state a claim.  See ECF No. 92.  A judgment in favor of plaintiffs
that no coverage exists under the Policy would necessarily
foreclose all of defendants' counterclaims and intervenors'
claims.  Intervenors' claims are identical to defendants' first
three counterclaims, and a "subrogee is subject to whatever
defenses the third party might have asserted against its insured."
Fed. Ins. Co. v. Arthur Andersen & Co., 75 N.Y.2d 366, 372 (N.Y.

1990).

Only River Marine filed an opposition to plaintiffs' summary judgment motion.  See ECF No. 98.  Although plaintiffs filed a Rule 56.1 statement along with the motion for summary judgment, see ECF No. 94, no party responded to it.  Thus, we "conclude that the facts asserted in the statement are uncontested and admissible."  T.Y. v. New York City Dept. of Educ., 584 F.3d 412, 418 (2d Cir. 2009).  Further, "[i]n the typical case, failure to respond results in a grant of summary judgment once the court assures itself that Rule 56's other requirements have been met." Id.

The following undisputed facts are drawn from the 56.1 statement, as well as from the Amended Complaint (ECF No. 1).[1]

## II.  Relevant Parties

River Marine is a marine services business formed in 2010 by Captain David Smith, which operated towboats in the Ohio River and its tributaries.  See 56.1 ¶ 3.  Captain Smith was the sole owner and general manager of River Marine at all relevant times.  Id.

---

[1]     The Court notes the unprofessional quality of River Marine's opposition papers.  The Opposition, which is four pages in length, is at times difficult to comprehend and has more the quality of a draft than a final product.  There are multiple grammatical and typographical errors littered throughout the brief, and citations to the record include no page numbers or docket number references and instead use a generic "(cite)" reference.  Additionally, River Marine appears to have abandoned the Bluebook entirely when citing to case law, utilizing "@" at each case cite.  See ECF No. 98.

Captain Smith and his brother had also owned and operated GCRT, another marine services business, that ceased operations in 2012 when its operations were "rolled" into the operations of River Marine.  Id. ¶¶ 2,4.  GCRT is not a named insured or additional insured under the Policy.  Captain Smith is also the sole owner of Western River Assets, LLC, which is the owner of the GATE CITY, the vessel that was the subject of the insurance Policy at issue in this litigation.  Id. ¶ 1.[2]  River Marine's non-party insurance broker, the Ash Group, procured insurance policies and handled claims for River Marine during the relevant period.  Id. ¶ 9.

Safe Harbor "is a syndicate of insurance companies that provide marine pollution insurance."  Id. ¶ 5.  Safe Harbor Pollution Insurance functions as the managing general agent, with Starr Indemnity & Liability Company ("Starr"), Argonaut Insurance Company ("Argonaut"), and Berkshire Hathaway Specialty Insurance Company ("Berkshire") as the constituent insurance companies in the syndicate.  Id.  Safe Harbor issued marine pollution insurance policies to River Marine, including the Policy that covered the GATE CITY, which was first issued in 2015 and was subsequently renewed in the following years.  See 56.1 ¶ 6.  The 2015-2016 policy (V-13970-15) was underwritten by Starr 100%, the 2016-2017

---

[2]     While Western River Assets, LLC is listed as an additional insured in the Policy, this does not impact the analysis that follows.

policy (V-13970-16) was underwritten by Starr 28.5714%, Argonaut 57.1428%, and Berkshire 14.2858%, and the 2017-2018 (V-13970-17) policy was underwritten by Starr 28.5714%, Argonaut 57.1428%, and Berkshire 14.2858%.  See Amend. Compl. ¶¶ 14-16.

Liberty Mutual Insurance Company, Navigators Insurance Company, and Endurance American Specialty issued their own policies to River Marine, covering the GATE CITY as well.  See 56.1 ¶ 7.

### III.  Factual Background

a. *The GATE CITY*

On September 3, 2007, Western River Assets, LLC purchased the GATE CITY for $300,000.  Id. ¶ 10.  Prior to purchasing the vessel, Western River Assets, LLC ordered a pre-purchase survey that assessed the thickness and integrity of the GATE CITY's hull.  Id. ¶ 11.  On September 4, 2007, Ash Group, on behalf of GCRT, spoke with Water Quality Insurance Syndicate ("WQIS"), GCRT's pollution insurer, about adding the GATE CITY to the schedule of insured vessels.  Id. ¶ 13.  On January 22, 2008, the Ash Group requested that the GATE CITY be placed on "Port Risk" effective November 19, 2007.  Id.  Vessels are placed on Port Risk when there is an intention to return them to service, or when they are being prepared for sales, and thus they typically undergo repairs.  Id.

¶ 14.  In August 2008, the GATE CITY was taken out of service, and in 2009, GCRT moored it in the Big Sandy River while it was not in use.  Id. ¶¶ 15-16.

At the time the GATE CITY was purchased, in 2007, it had deficient hull plating, which was due for replacement and likely to deteriorate further without upkeep or maintenance.  Id. ¶¶ 17-19.  Typically, with loss control measures in place, a vessel will be hauled out of water, a processing known as "drydocking," so that the hull can be examined and any issues can be remedied.  Id. ¶¶ 20-22.  River Marine failed to perform maintenance or surveys on the GATE CITY's hull, inspected the hull once in March 2009, and other than a 2008 drydocking to change its wheel, the vessel was never drydocked from 2009 to January 2018.  Id. ¶¶ 23-25.  River Marine also did not follow policies included in its an "Operations Manual," such as following a drydocking schedule and monthly hull maintenance and inspection procedures.  Id. ¶¶ 32-37.

In 2015, Ash Group began to seek additional insurance premium quotes from liability underwriters due to a proposed premium increase by WQIS.  Id. ¶ 98.  On July 14, 2015, Ash Group wrote to a partner at Safe Harbor, Russell Brown, requesting a quote for vessel owner insurance.  While Brown had worked previously at WQIS,

he "did not recall ever being involved with the River Marine account." Id. ¶¶ 99-101. Ash Group also provided documents indicating that Captain Smith had a long history of operating towboats and held safety and maintenance of vessels as a high priority. Id. ¶¶ 102-04. While River Marine informed Safe Harbor that the GATE CITY was on Port Risk at the time, which resulted in a lower insurance premium, Safe Harbor was not told that the vessel had been on Port Risk as far back as 2011 and that the reason for being on Port Risk was a lack of work. Id. ¶¶ 105-108. Unaware of these potential red flags, Safe Harbor issued the Policy covering GATE CITY in 2015, and the Policy was subsequently renewed in the following years. Id. ¶¶ 111-14.

In 2016, Todd Keeton, a River Marine deckhand, discovered that the GATE CITY was taking on water. Id. ¶ 40. Keeton's job responsibilities included conducting daily inspections of the GATE CITY to "make sure . . . it [was] still floating." Id. ¶ 41. He did not follow a formal set of procedures and would take approximately thirty to forty-five minutes to inspect both the GATE CITY and another vessel. Id. Following the discovery that the GATE CITY was taking on water, Keeton used an electric pump each week to remove water from the vessel. Id. ¶ 42. Although Captain Smith was made aware of the issue, it was never determined

how the water had entered the hull and no repairs were made.  Id.
¶¶ 43-46.

 *b. The Coast Guard Order*

On December 5, 2017, the United States Coast Guard issued an
Administrative Order to River Marine, which River Marine did not
contest, stating that the Coast Guard "determined that there is an
imminent and substantial threat of discharge of oil into navigable
waters of the United States from . . . M/V GATE CITY."  Id. ¶¶ 48,
51.  River Marine understood that it was subject to liability under
the Coast Guard Order and that the Order required removal of all
oil onboard the GATE CITY.  Id. ¶¶ 52-54.

Under the terms of the Policy, River Marine was required to
provide "immediate notice" to Safe Harbor "in the event of an
occurrence or incident which may give rise to a claim under [the]
policy."  Id. ¶ 55.  Although the Coast Guard Order constituted an
occurrence under the Policy, River Marine did not advise either
the Ash Group or Safe Harbor about it.  Id. ¶¶ 57-58.

Instead, River Marine contacted an environmental services
company, Safety Kleen, and obtained an estimate of $4,500 to remove
oil from the GATE CITY and an additional vessel.  Id. ¶¶ 59-60.
However, following the initial price quote, River Marine
determined not to engage Safety Kleen.  Id. ¶ 61.

   *c. The Sinking of the GATE CITY*

On January 10, 2018, Ash Group notified Safe Harbor that the GATE CITY had sank and caused an oil spill.  Id. ¶ 66.  Safe Harbor immediately engaged a spill response manager and in the course of investigating the sinking of the vessel, discovered the Coast Guard Order.  Id. ¶¶ 67-69.  Investigation of the GATE CITY also showed that the hull was severely deteriorated, with multiple corrosion holes, and was covered in rust blisters and debris.  Id. ¶¶ 81-90.  The vessel's engine room was also found to be in complete disarray, with multiple systems disconnected and in various states of disrepair.  Id. ¶¶ 91-95.

As a result of the sinking of the GATE CITY, River Marine claims that $4,411,572.43 in expenses are owed under the Policy, and intervenors claim that they paid $1,460,000 that should have been paid under the Policy.  Id. ¶¶ 79-80.  River Marine also requests that Safe Harbor defend and indemnify West River Assets and GCRT in a lawsuit brought by the City of Kenosha, seeking $150,765.47 for cleanup costs from the oil spill.  See Amend. Complaint ¶ 35-37.

## STANDARD OF REVIEW

Summary judgment is properly granted where "there is no genuine dispute as to any material fact and the movant is entitled

-11-

to judgment as a matter of law." Fed. R. Civ. P. 56. "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion," as well as the basis for any absence of material fact in dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Courts must "construe the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor." Gilman v. Marsh & McLennan Cos., Inc., 826 F.3d 69, 73 (2d Cir. 2016).

"[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

**DISCUSSION**

Both parties agree that maritime law governs this case.  See MSJ at 7-8, Opp'n at 3.  According to the choice of law provision set forth in the Policy, in the absence of maritime law, we look to "the law of the State of New York."  See Amend. Compl. Ex. A at 34 (ECF No. 9-1).

In their papers, plaintiffs advance three bases to support their position that defendants' actions, or lack thereof, voided the Policy.[3]  We will examine each in turn.

## I. River Marine Failed to Notify Safe Harbor of an Occurrence, Which Voided the Policy

First, plaintiffs maintain that defendants failed to notify them of an occurrence, which under the Policy they were obligated to do.  Specifically, the terms of the Policy provide:

> (a)  IN THE EVENT OF ANY OCCURRENCE OR INCIDENT WHICH MAY GIVE RISE TO A CLAIM UNDER THIS POLICY, THE INSURED SHALL GIVE IMMEDIATE NOTICE OF SAID OCCURRENCE OR INCIDENT TO THE COMPANY
>
> * * *
>
> (d)  It is essential that the Insured provide the Company with immediate notice of the occurrence of any incident which is potentially covered by this Policy and/or to which the Insured may have liability or as to which the Insured may be required to enter a defense.
>
> * * *
>
> (e)  LIMITATION DUE TO FAILURE TO NOTIFY: The Company will not have any exposure or liability under this Policy

---

[3]    While we may, on occasion, reference "defendants," we primarily reference River Marine, as GCRT had no independent status following 2012.  While Western River Assets, LLC is an additional insured under the Policy as the owner of the GATE CITY, it has no claims independent of those of River Marine.

>     if, for lack of immediate notice an incident is made
>     worse or more extensive because the Company was unable,
>     for lack of immediate notice, to undertake effective
>     managerial or remedial measures.

See Amend. Compl. Ex. A at 34-35 (ECF No. 9-1).  It is undisputed that the December 5, 2017 Coast Guard Order "constituted an Occurrence under the Safe Harbor Policy issued to River Marine which required River Marine to provide immediate notice to Safe Harbor."  Id. ¶ 57.  It also undisputed that River Marine never notified Safe Harbor of the Coast Guard Order, despite the fact that River Marine understood both that the Order "required the removal of all oil onboard both the GATE CITY and the ANNA C by no later than January 31, 2018," and that River Marine "was subject to liability under the Oil Pollution Act of 1990 due to a substantial threat of discharge of oil from the GATE CITY."  Id. ¶¶ 52-53, 58.

    The law relevant to this issue is well established.  First, as a general matter, "[u]nder New York law, compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy." Sparacino v. Pawtucket Mut. Ins. Co., 50 F.3d 141, 143 (2d Cir. 1995); Argo Corp. v. Greater N.Y. Mut. Ins. Co., 4 N.Y.3d 332, 339 (N.Y. 2005) ("[A]bsence of timely notice of an occurrence is a failure to comply with a condition precedent which, as a matter of

law, vitiates the contract.").

Second, "[w]hen an insurance policy requires immediate notice of a claim, courts have held even short delays to be unreasonable." Travelers Indem. Co. v. Northrop Grumman Corp., 3 F. Supp. 3d 79, 103 (S.D.N.Y. 2014); Mark A. Varrichio and Assocs. v. Chicago Ins. Co., No. 01 Civ. 2737 (RLC), 2001 WL 1524475, at *3 (S.D.N.Y. Nov. 29, 2001) ("[B]oth state and federal courts in this state have routinely found that relatively short delays in providing notice violate an immediate notice requirement."). "Whether an insured's notice is timely depends on (1) when the insured's notice obligation arose and (2) whether the insured promptly gave notice within the timeframe of the policy." New York Marine & Gen. Ins. Co. v. Travelers Property Cas. Co. of Am., 485 F. Supp. 3d 398, 406 (S.D.N.Y. 2020) (internal quotation marks and citation omitted). "The test for determining whether the notice provision has been triggered is whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim." Sparacino, 50 F.3d 141 at 143.

Moreover, in any instance in which an insured did not provide immediate notice, "[t]he insured bears the burden of showing any delay was reasonable under the circumstances." Travelers Indem. Co., 3 F. Supp. 3d at 103. "A delay may be found unreasonable as

a matter of law when no excuse for the delay is offered or the proffered excuse is meritless." Id. Certain "circumstances may exist that will excuse or explain the insured's delay in giving notice, such as lack of knowledge that an accident has occurred, or a reasonable belief in nonliability." Travelers Indem. Co. v. Northrop Grumman Corp., 413 F. Supp. 3d 263, 273-74 (S.D.N.Y. 2019) (internal quotation marks and citation omitted). While "[t]he sufficiency of an excuse ordinarily presents a question of fact to be determined at trial," the determination of whether the excuse is reasonable "may be determined as a matter of law where the evidence, construing all inferences in favor of the insured, establishes that the belief was unreasonable or in bad faith." Id. at 274.

In this instance, as stated above, River Marine has conceded that it knew that it was obligated to provide notice under the Policy and that no notice was ever provided. See 56.1 ¶¶ 57, 58. Further, River Marine has not attempted to offer any excuse for the lack of notice. Thus, the Policy is void based on River Marine's failure to notify.

While Section 3420 of New York Insurance law requires a showing of prejudice based on a claim of failure to provide timely notice, this does not apply to "the kinds of insurance set forth

in paragraph three of subsection (b) of section two thousand one hundred seventeen of [the same] chapter." <u>Progressive Northeastern Ins. Co. v. Am. Ins. Co.</u>, No. 99 Civ. 8998, 2001 WL 959183, at *3 (S.D.N.Y. Aug. 21, 2001) (quoting N.Y. Ins. Law § 3420(i)).  Section 2117(b) includes "insurance in connection with ocean going vessels against any of the risks specified in paragraph twenty-one of subsection (a) of section one thousand one hundred thirteen of this chapter."  N.Y. Ins. Law § 2117(b)(3)(B). Paragraph 21 of Section 1113 concerns "marine protection and indemnity insurance," including insurance against "loss, damage or expense arising out of, or incident to, the ownership, operating, chartering, maintenance, use, repair or construction of any vessel, craft or instrumentality in use in ocean or inland waterways . . . "  N.Y. Ins. Law § 1113(21).  Therefore, we find that Safe Harbor does not need to show prejudice based on its failure to notify claim.

Even if Safe Harbor were required to prove that it was prejudiced by River Marine's failure to notify, it has done so. An insurer is prejudiced where they are unable to take "any steps to mitigate [their] liability and protect [their] interests." <u>Chrysler First Fin. Servs. Corp. of Am. v. Chicago Title Ins. Co.</u>, 641 N.Y.S.2d 13, 14 (N.Y. App. Div. 1996).  Notice-of-occurrence

provisions also "enable insurers to make a timely investigation of relevant events."  <u>Commercial Union Ins. Co. v. Int'l Flavors & Fragrances, Inc.</u>, 822 F.2d 267, 271 (2d Cir. 1987).  River Marine concedes that Safe Harbor has access to a network of spill response managers and other services meant to aid insureds in the case of an active discharge or threat of discharge.  <u>See</u> 56.1 ¶¶ 63-64. It also undisputed that, had River Marine alerted Safe Harbor to the Coast Guard Order, Safe Harbor's spill response manager would have helped mitigate the threat of pollution and coordinated a prompt cleanup of the GATE CITY.  <u>Id.</u> ¶¶ 70-71.  Instead, "River Marine prevented Safe Harbor from being able to assist in the mitigation and response to the substantial threat of pollution before the vessel ultimately sank."  <u>Id.</u> ¶ 76.  Further, River Marine's failure to notify Safe Harbor resulted in millions of dollars' worth of payments in pollution removal expenses.  <u>Id.</u> ¶¶ 79-80.

While failure to provide notice would in and of itself be sufficient to void the Policy, plaintiffs advance two other bases, each of which is sufficient as well.

## II. Safe Harbor's Additional Claims Also Void the Policy

### a. River Marine Failed to Comply With an Express Warranty to Exercise Due Diligence to Maintain GATE CITY in a Seaworthy Condition

Plaintiffs also maintain that the Policy is void based on River Marine's failure to comply with an express warranty that stated that the GATE CITY would be maintained in a seaworthy condition.  See MSJ at 8-13.  Specifically, the Policy contains a provision stating that breach of any warranty voids the policy. The language is as follows:

> (b)  The Insured's breach of any warranty, express or implied, contained in this Policy shall immediately void this Policy as of the time of the breach and no claim shall be paid under this Policy for losses arising after the breach.  The Company may, at its sole discretion, continue coverage provided that (i) it has received written notice of the breach from the Insured, and (ii) the Insured has paid any additional premium as the Company may require and the Company has confirmed in writing that coverage is continued.

See Amend. Compl. Ex. A at 24.  The warranty at issue is: "[i]t is warranted by the Insured that, after the inception of the Policy, the Insured shall at all times use due diligence to maintain [the GATE CITY] in a seaworthy condition."  Id.

This warranty claim must be considered in the following legal framework:  "Under the federal rule and the law of most states, warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to recover." Commercial Union Ins. Co. v. Flagship Marine Servs., Inc., 190 F.3d 26, 31 (2d Cir. 1999).  In Commercial Union, the Second

Circuit explained that "[t]he rule of strict compliance with warranties in marine insurance contracts stems from the recognition that it is peculiarly difficult for marine insurers to assess their risk, such that insurers must rely on representations and warranties made by insureds regarding their vessels' condition and usage." Id. at 31-32.  Further, courts in New York treat the failure to comply with an express warranty as precluding recovery under a policy, regardless of whether the warranty was causally related to the ultimate loss.  See, e.g., Jarvis Towing & Transp. Corp. v. Aetna Ins. Co., 298 N.Y. 280, 282 (N.Y. 1948) (finding that plaintiff's violation of an express warranty requiring inspection of the vessel by patrolmen voided the policy even though the violation was unrelated to the vessel sinking).

The breach of warranty claim must also be evaluated in light of the defendants' numerous factual concessions.  To begin, defendants concede that River Marine "did not perform any hull maintenance on the GATE CITY, nor did it take any protective measures designed to preserve the structural integrity of the vessel's hull while the vessel was on lay up." 56.1 ¶ 23.  Other than one dive inspection in March 2009, River Marine never inspected GATE CITY's hull, never performed surveys of the vessel, and never installed coatings or protective anodes or painted the

-20-

hull.  Id. ¶¶ 25-28.  River Marine also concedes that it did not follow policies set forth in its own Operations Manual, including that it "did not follow the drydocking schedule," and "did not perform any monthly safety inspections or annual audits on the GATE CITY."  Id. ¶¶ 36-37.  Further, in 2016 when the GATE CITY began to take on water, "no repairs were ever made to stop the ingress of water," and "Captain Smith never determined how the water was entering through the hull of the GATE CITY."  Id. ¶¶ 40, 45-46.

Moreover, when the GATE CITY eventually sank, its hull "was severely compromised by substantial corrosion in the form of pitting, rust blistering and thinning of shell plating," with numerous corrosion holes.  Id. ¶¶ 81-87.  The engine room was "found to be in total disarray with multiple systems, their components, pipelines, cable connections, controls and service pumps either disconnected, removed, partially missing and/or in various stages of disassembly or dismantlement."  Id. ¶ 91.  The engines themselves were also in a complete state of disrepair, and River Marine concedes that the GATE CITY "was not fit for layup on the bank of the Big Sandy River."  Id. ¶ 92-95.  Given the conditions of the GATE CITY, it is clear that it was not seaworthy. See In re Complaint of Messina, 574 F.3d 119, 127 (2d Cir. 2009)

("[S]eaworthiness is a relative term depending upon its application to the type of vessel and the nature of the voyage. The general rule is that the vessel must be staunch, strong, [and] well equipped for the intended voyage . . . ."); McAllister Lighterage Line, Inc. v. Ins. Co. of N. Am., 244 F.2d 867, 870 (2d Cir. 1957) ("Seaworthiness" means "the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes.").

To the extent that River Marine attempts to contest Safe Harbor's claim, the attempts are illogical and unavailing. The opposition to the breach of warranty claim states that River Marine "had an employer [sic] check on the vessel twice a day to ensure it was floating and the void spaces were dry." Opp'n at 1. This is by no means sufficient maintenance of the GATE CITY, and Safe Harbor acknowledges that this was the sole action taken by River Marine. See 56.1 ¶ 41. River Marine also cites Atlantic Specialty Ins. Co. v. Coastal Envtl. Grp. Inc., 945 F.3d 53 (2d Cir. 2019) in what appears to be an effort to argue that a factual dispute exists regarding the reason that the vessel sank. See Opp'n at 3. The reference to Atlantic Specialty is misplaced, since the court in that case did not hold that there was a material fact in dispute regarding the cause of the sinking. Additionally, unlike in this

case, the <u>Atlantic Specialty</u> defendants had contested the plaintiff's factual findings regarding seaworthiness.  945 F.3d at 67-69.  Defendants' effort to create a dispute about the cause of the sinking of the GATE CITY is irrelevant, since the breach of the express warranty is admitted.  <u>See</u> 56.1 ¶ 118 ("Prior to the January 2018 sinking incident, Safe Harbor did not receive written notice from River Marine that it had breached it [<u>sic</u>] warranty to exercise due diligence to maintain the GATE CITY in a seaworthy condition.").

Thus, the Policy is void based on River Marine's violation of the express warranty requiring maintenance of the GATE CITY in a seaworthy condition.

   b. *River Marine Failed to Disclose Material Facts to Safe Harbor, Which Voided the Policy*

Safe Harbor also maintains that River Marine violated the doctrine of <u>uberrimae fidei</u>.  <u>See</u> MTD at 21.  The doctrine of <u>uberrimae fidei</u> is based on the practical reality that an "insured is more likely to be aware of information that materially affects the risk being insured, and that often the insurer lacks the practicable means to verify the accuracy or sufficiency of facts provided by the insured for purposes of establishing the contractual terms."  <u>Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York</u>, 822 F.3d 620, 633 (2d Cir. 2016) (internal quotation

marks and citation omitted).  "Accordingly, under the doctrine, the party seeking insurance is required to disclose all circumstances known to it which materially affect the risk."  Id. (internal quotation marks and citation omitted).  "Failure by the insured to disclose all available information will allow the insurer to avoid the policy, regardless of whether such omission is intentional or results from mistake, accident, forgetfulness, or inadvertence."  Id. (internal quotation marks and citation omitted).

"[T]he principle of uberrimae fidei does not require the voiding of the contract unless the undisclosed facts were material and relied upon."  Id. (internal quotation marks and citation omitted).  "A non-disclosed fact is material if it would have affected the insurer's decision to insure at all or at a particular premium."  NY Marine & Gen. Ins. Co. v. Tradeline (L.L.C.), 266 F.3d 112, 123 (2d Cir. 2001).  Facts regarding deterioration of a vessel and failure to perform recommended maintenance are considered material.  See Fireman's Funds Ins. Co., 822 F.3d at 638-40 (finding that insurer could void marine pollution insurance policy where drydock owner failed to disclose information regarding the deterioration of the drydock and failure to perform necessary repairs).

River Marine does not dispute that it failed to disclose that it did not follow its own drydocking schedule, did not perform maintenance or safety inspections of the GATE CITY, and allowed the GATE CITY to fall into a state of complete disrepair.  See 56.1 ¶¶ 25-31, 36-40.  River Marine further concedes that had Safe Harbor been aware of this information, it would not have agreed to underwrite the GATE CITY.  Id. ¶ 115.  Further, River Marine did not advise Safe Harbor that "the alleged reason for the GATE CITY being on Port Risk was a lack of work."  Id. ¶ 106.  As a result of these material misrepresentations and omissions, "the policy may be voided ab initio."  RLI Ins. Co. v. JDJ Marine, Inc., No. 07 Civ. 9546 (GBD), 2012 WL 3765026, at *4 (S.D.N.Y. Aug. 29, 2012).

River Marine appears to argue that Safe Harbor was aware of information regarding Port Risk because Safe Harbor's underwriter, Russell Brown, worked at River Marine's prior insurer when the GATE CITY became a Port Risk.  See Opp'n at 1.  However, River Marine does not dispute that Brown "did not recall ever being involved with the River Marine account while employed at WQIS, the predecessor insurer for owner/operator pollution liability coverage."  56.1 ¶ 101.  In any event, River Marine does not claim that Brown was aware of the poor condition of the GATE CITY or the

fact that River Marine was not conducting the appropriate repairs
and maintenance.[4]   Given River Marine's failure to disclose
material facts to Safe Harbor, thereby violating the doctrine of
uberrimae fidei, the Policy is void ab initio.

### III. River Marine's Bad-Faith Counterclaim is Dismissed

In its Counterclaims, River Marine asserts a cause of action
for "Bad-Faith Coverage Denial."   See Answer, Defenses,
Counterclaims and Demand for Trial by Jury (ECF No. 25) ¶¶ 27-37.
Courts in this district have held that a claim of bad faith denial
of coverage under an insurance policy cannot constitute an
independent tort.  See Sichel v. UNUM Provident Corp., 230 F. Supp.
2d 325, 328-29 (S.D.N.Y. 2002) (collecting cases).   Further,
"[m]ere difference of opinion between an insurer and an insured
over the availability of coverage does not constitute bad faith;
to show bad faith the insured must demonstrate that no reasonable
carrier would, under the given facts deny coverage."  Jane Street
Holding, LLC v. Aspen Am. Ins. Co., No. 13 Civ. 2291 (RWS), 2014
WL 28600, at *10 (S.D.N.Y. Jan. 2, 2014) (internal quotation marks
and citation omitted).

Here, it is clear that Safe Harbor had legitimate reasons to

---

[4]      To the extent that River Marine relies on Atlantic Specialty, it is once
again inapposite.  The court made no connection between a material dispute
regarding the cause of the vessel sinking and violation of uberrimae fidei.
See Atlantic Specialty, 945 F.3d at 66-67.

void the Policy, and River Marine has failed to identify facts that would support a claim for "bad faith" by Safe Harbor rather than "mere difference of opinion."  Additionally, this claim is "duplicative of [River Marine's] first cause of action for breach of contract" and therefore is dismissed.  New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 320 (N.Y. 1995).

We likewise dismiss River Marine's request for punitive damages.  In order to state a claim for punitive damages, a complaint "must first state a claim of egregious tortious conduct directed at the insured claimant."  Wiener v. Unumprovident Corp., 202 F. Supp. 2d 116, 123 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).  Given that River Marine has failed to state an underlying tort cause of action, and certainly fails to establish any "egregious tortious conduct," the request for punitive damages also fails.

**CONCLUSION**

Accordingly, for the reasons stated above, Safe Harbor's motion for summary judgment is granted in its entirety, and River Marine's fourth counterclaim is dismissed.  Specifically, the Court declares that the Policy issued by Safe Harbor to River Marine was void at the time the GATE CITY sank based on River Marine's violation of an express warranty.  The Court also declares

that no coverage exists under the Policy for pollution mitigation expenses and/or liabilities incurred by defendants as a result of defendants' violation of the doctrine of uberrimae fidei, rendering the Policy void ab initio, as well as for defendants' failure to provide timely notice of an occurrence to plaintiffs.

In addition, summary judgment is granted dismissing GCRT's counterclaims, as it is not an insured or additional insured under the Policy.  Summary judgment is also granted on intervenors' claims, which are identical to the first three of defendants' counterclaims.  See supra, p. 4; see Arthur Anderson & Co., 75 N.Y.2d at 372 ("The rights of an insurer as equitable subrogee against a third party are derivative and limited to such rights as the insured would have had against such third party for its default or wrongdoing.") (internal quotation marks and citation omitted). The Clerk of the Court is respectfully directed to terminate the motion pending at ECF No. 92 and to close the case.

**SO ORDERED.**

Dated:    New York, New York
          March 25, 2022

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

-28-